IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**ERIC WELLS,**                                          Case Number 1:15 CV 298

      Petitioner,                              Judge Jack Zouhary

    v.                                               REPORT AND RECOMMENDATION

**CHRISTOPHER LAROSE, Warden,**

      Respondent.                              Magistrate Judge James R. Knepp II

## INTRODUCTION

*Pro se Petitioner* Eric Wells, an Ohio prisoner, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent, Warden Christopher LaRose, filed an answer (Doc. 17), exhibits (Docs. 17-1 & 17-2), and state court transcripts (Doc. 18). Petitioner filed a reply (Doc. 21), Respondent filed a sur-reply (Doc. 22), and Wells filed a letter regarding case law (Doc. 23). The district court has jurisdiction over this petition under 28 U.S.C. § 2254(a). This case is before the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) for findings of fact, conclusions of law, and recommendations. *See* non-document entry dated July 8, 2015. Following review, and for the reasons stated below, the undersigned recommends the Petition be dismissed.

## FACTUAL BACKGROUND

In 2012, a jury convicted Wells of aggravated murder with firearm specifications, and the court found Wells guilty of having a weapon under a disability. The trial court merged for sentencing the firearm specifications. The court ordered that the corresponding three-year sentence on the specifications be served prior and consecutive to the sentence of twenty-five

years to life for the aggravated murder conviction. Wells was also sentenced to thirty months of imprisonment on the weapons under disability charge, which was ordered to be served concurrently with the aggravated murder sentence. *Ohio v. Wells*, 2013 WL 4680491, at *5 (Ohio Ct. App. Aug. 29, 2013).

### Prior State Conviction – Case Number **CR-09-525073**

In case number CR-09-525073, a Cuyahoga County (Ohio) Grand Jury indicted Wells on one count of drug trafficking in violation of Ohio Rev. Code § 2925.03(A)(2) with a forfeiture specification, one count of drug possession in violation of Ohio Rev. Code § 2925.11(A) with a forfeiture specification, and one count of possessing criminal tools in violation of Ohio Rev. Code § 2923.24(A) with a forfeiture specification. (Doc. 17-1, at 9-11). Wells subsequently pleaded guilty to the drug trafficking offense while the remaining charges were dismissed. On March 22, 2010, Wells was sentenced to one-year of community control. (Doc. 17-1, at 13).

On April 7, 2010, the trial court issued a capias for Wells at the request of a probation officer. (Doc. 17-1, at 14). On April 30, 2012, the trial court dismissed Wells's community control sanctions, citing his sentence in the aggravated murder case (Case Number CR-10-536779). (Doc. 17-1, at 15). Wells did not appeal or collaterally challenge his drug trafficking conviction or the parole violation determination.

### Current Conviction – Case Number **CR-10-536779**

The Ohio Court of Appeals summarized the facts of Wells's murder case as follows:

{¶ 1} On May 19, 2010, defendant-appellant, Eric Wells, was indicted for the murder of Devin Webb. He was charged with aggravated murder in violation of R.C. 2903.01(A), with one-and three-year firearm specifications, and having a weapon while under disability in violation of R.C. 2923.13(A)(3). On April 23, 2012, Wells's trial commenced, and the jury heard the following evidence.

{¶ 2} In the early evening of August 14, 2006, police officers Klomfas and Miles responded to a call for a male shot in the area of West 80th Street and Detroit Road near a convenience store in Cleveland. Upon arrival, the victim, Webb, was being treated by paramedics and was transported to MetroHealth Medical Center where he was pronounced dead on arrival. Dr. Stanley Seligman, who conducted the autopsy, testified that Webb suffered three gunshot wounds—one each to his chest, hand, and wrist. According to Dr. Seligman, Webb's cause of death was multiple gunshots wounds, and the manner of death was homicide. A city of Cleveland firearm examiner testified that based on the bullet recovered, the gun used to shoot Webb was consistent with a .38 special or .357 Magnum.

{¶ 3} At the crime scene, officers and detectives interviewed witnesses, collected evidence, and assessed the area. Officer Klomfas testified that based on his initial interviews with witnesses, he learned that two people knew the shooter. He also observed security cameras affixed to a nearby building that possibly would have captured the crime. He contacted the maintenance supervisor for the building, who in turn called the security company. The officers were able to obtain surveillance video from three different angles showing the location where the murder occurred and footage of the victim, suspect, and eyewitness prior to, during, and after the shooting. Detective Tom Ciula, video forensic specialist, testified that he was able to enhance the video and make still-frames of the scenes and suspect, but none of the video angles revealed the suspect's face.

{¶ 4} Detective Melvin Smith testified that when he arrived on scene with his partner, Detective Joselito Sandoval, he diagramed the crime scene and viewed the surveillance video, noting that the suspect had a pronounced way of swinging his arms back and forth and a limp in his walk. He also spoke with various witnesses, including Jasmine Diaz, and made reports from those interviews.

{¶ 5} Diaz testified at trial that in 2006 she was a known drug user and has a criminal history. She stated that two months prior to the murder, she was at "Dave's" drinking and doing drugs when she met "Eric," who was wearing a white do-rag, dark jeans, and a t-shirt; he also had dark moustache with gray spots. She saw "Eric" again about a day or two before the murder, they discussed a letter he received from RTA about a possible monetary settlement. "Eric" was again wearing a white do-rag, black t-shirt, blue pants, and white tennis shoes. Diaz testified that on the day of the murder, she was buying and using crack cocaine. She saw "Eric" again and spoke to him for a few minutes about the RTA settlement. According to Diaz, "Eric" told her that he "was working down his way to his people's house to get more money." About four or five minutes later, she heard shots being fired.

{¶ 6} Diaz was shown the surveillance video in open court. From the video, she identified "Eric" as the man in the white do-rag; the victim, who she knew as

"Hottie" or "Teardrop"; and the other woman in the video as "Queenie." She admitted she did not witness the shooting, but said she saw "Eric" that day.

{¶ 7} Detective Sandoval testified that he also interviewed witnesses at the crime scene, including Gwendolyn Wiley and Lea Johnson.

{¶ 8} Wiley, who is also known as "Queenie," testified that she has a criminal history, and that although she has been sober from drugs for about seven years, she was a drug addict in 2006. She stated that she knew Webb as "Hottie" and a man with a slender build, a "hitched walk," salt and pepper beard, and do-rag as "Eric." On August 14, 2006, Wiley witnessed the murder of Webb. She testified that she saw Hottie going to the store, so she decided to wait for him in the street. At that point, Eric, wearing a white do-rag, approached her and asked her about drugs. She told him that Hottie might have some, but Hottie said "no." Eric then asked her, "Queenie, what's he saying?" to which she replied, quoting Hottie, "If you ain't got no money get off my damn block." Wiley stated she and Hottie started laughing about this, but Eric then ran towards Hottie and shot him.

{¶ 9} Johnson testified that she knew Webb as "Hottie." On the night of the murder, she saw Hottie walking from the corner store, and then saw a male run up to him, point a gun, and shoot the gun three times. Johnson stated that she could not see the shooter's face, but the male was wearing a white wave cap, a white t-shirt with a black shirt over it, blue jeans, and white tennis shoes.

{¶ 10} Detective John Morgan also worked the crime scene interviewing witnesses, including the Washtocks. Helen Washtock testified that on August 14, 2006, at around 7:50 p.m. she heard gunshots. When she ran to the window, she saw a black man who was wearing a white do-rag, a dark colored shirt with a white-colored shirt underneath, and blue jeans, running from the direction of the store. She said he then "jumped" into an older model car that was greenish-blue in color.

{¶ 11} Other witnesses also testified regarding what they saw that evening. Joanne Flores testified that she was about to go to the corner convenience store when she saw a young black man with a "goatee—pepper-like" wearing a white do-rag or hat and white tennis shoes and pacing around the side of the street. About 15 minutes later, she heard gunshots. She opened the curtains and saw "the dude running away" and "Hottie" lying on the ground. She saw the male who was running put a "long black gun" in the back of his pants. Although she told police that she could recognize the male again, she was never contacted by the police to look at any photo array. She was not asked at trial if Wells was the person she saw that evening.

{¶ 12} Anas Husien, the convenience store owner, testified that after he heard gunshots, he saw a man walking up the street pretty quickly tucking, what

4

appeared to him to be a .357 gun, in the back of his pants. Husien described the man as wearing jeans, a white do-rag, and a dark shirt over a t-shirt.

{¶ 13} Based on all the interviews and observances from the surveillance video, the detectives had a consistent description of the suspect—black male, wearing a white do-rag, jeans, white tennis shoes, and white t-shirt with a black shirt over it. They also knew the suspect was named "Eric," "Will," or "Wills."

{¶ 14} The following day, Detective Sandoval interviewed David Morgan, and received from him, a wave cap that the suspect was purportedly wearing. It was unclear whether the cap was relayed as the cap the suspect was wearing that night, but Morgan affirmatively stated that the cap belonged to the suspect. Detective Smith testified the wave cap was an important piece of evidence because, at the time, no one could identify the suspect by name, and therefore, DNA on the cap could lead to an identification. Ultimately, no DNA from the cap was matched to Wells.

{¶ 15} Morgan testified that he is a known drug user and has a criminal history. He stated that on August 14, 2006, he was living off West 83rd Street and Detroit Road. He knew Webb as "Hottie" and Wiley as "Queenie." He testified that Hottie was his drug dealer, and he used to smoke with Queenie. Morgan also testified that he used to smoke with Wells and that Wells would "crash" at his apartment. He described Wells as scruffy with a slight build, salt and pepper goatee, and said dressed like a construction worker—jeans, boots, tennis shoes, a t-shirt, flannel shirt, and a wave cap under a baseball hat.

{¶ 16} Morgan testified that Wells had discussed with him previously that he had a problem with a guy on West 80th. According to Morgan, it had something to do with a confrontation with Hottie and Wells's cousin. Morgan testified that Wells had spent the night at his house the night before the murder. According to Morgan, Wells told him that his cousin was supposed to come over because "they had to take care of some family business." He said that before he left the apartment, Morgan testified that Wells was wearing a white wave cap, black t-shirt, a dark flannel shirt, and jeans, and had in his possession a .357 revolver. After Wells left, Morgan heard three gunshots and then saw Wells running away from the scene.

{¶ 17} According to Detective Smith, the case became cold over time. Because they had surveillance video and the suspect had a distinct walk, he asked the Crimestoppers unit to assist in the investigation. Sergeant David Rutt, coordinator of the Crimestoppers unit, created a television episode with the use of the surveillance video tape. The episode aired in February 2009, and remained on the internet. After the video aired, the police received a tip on February 28, 2009, that the shooter in the video was Eric Wells.

5

{¶ 18} Detective Smith testified that based on that tip, the police refocused their investigation on the initial observation that the suspect had a pronounced limp. Detective Smith testified that after learning that the suspect was possibly Eric Wells, he waited in an area where he knew Wells would be. As he waited, he noticed a man with a walk and mannerisms consistent with the person on the surveillance video who shot Webb. Upon further investigation, he learned that the man he observed walking was Wells.

{¶ 19} In March 2010, Detective Smith compiled two photo arrays, depicting Wells at time periods approximately six years apart, and showed them to Wiley and Diaz. Wiley positively identified Wells as the person she saw shoot Webb. At trial, Wiley testified that she was 100 percent certain that Wells shot Webb. Diaz also identified Wells as the person she knew as "Eric" and who she saw wearing the white do-rag and spoke to right before the murder occurred. Morgan was also shown a photo array and identified Wells as the person he saw with a gun immediately before the murder and wearing the same clothes as the suspect.

{¶ 20} Around that same time, Stacey Jarrell, an estranged cousin of Wells, learned that the suspect in the Crimestoppers episode was possibly Wells. When he viewed the episode over the internet, he was certain the suspect was Wells based on his mannerisms and walk. The following day he told his supervisors at the sheriff's department and made a report.

{¶ 21} As a result of the Crimestoppers tip, observations, and identifications, Wells was arrested for Webb's murder. After Wells was arrested and in custody at the Cuyahoga County jail, Shakim Allah, another inmate in the jail, contacted the county prosecutor's office claiming he had information regarding Wells's involvement in Webb's death. Allah met with detectives and told them that Wells had approached him about whether Allah could locate "Queenie" and "Jasmine" in his case because he did not want them to come to court. After speaking with the detectives, Allah positively identified Wells from a photo array as the person who had approached him.

{¶ 22} Allah testified at trial that he had known Wells since he was kid and knew him to have a "limp." According to Allah, he spoke with Wells in 2010 and Wells asked whether he knew "Queenie," "Shay," and "Jasmine." When Allah told him "yes," Wells inquired whether he could locate or call them because he did not want them to come to court and identify him. Wells also stated he was recorded on camera. According to Allah, Wells told him that he "popped Hottie because Hottie disrespected him," and that it was allegedly payback for a robbery.

{¶ 23} On cross-examination, Allah admitted to his lengthy criminal history, that he had written to the prosecutor's office stating he had this information about Wells, and that he had an upcoming probation violation hearing—meaning that he wanted help with his case in exchange for information on Wells. The jury also

6

heard that after he met with the detectives and provided this information, the prosecutor appeared at Allah's judicial release hearing and withdrew the state's previous objection for judicial release.

{¶ 24} While Wells was in police custody, Detectives Smith and Sandoval met with Wells to interview him. After the interview was over, Detective Sandoval used his cell phone to record Wells walking away with Detective Smith. The video was played for the jury to corroborate Detective Sandoval's testimony that he observed Wells walking with a distinct limp.

{¶ 25} The jury returned a verdict of guilty of aggravated murder and the attendant firearm specifications, and the trial court found Wells guilty of having a weapon while under disability. The trial court merged for sentencing the firearm specifications and ordered that the corresponding three-year sentence on the specification be served prior and consecutive to the sentence of 25 years to life on the aggravated murder charge. The court also sentenced Wells to 30 months on the weapon under disability charge, ordering that the sentence be served concurrently with the aggravated murder sentence.

*Wells*, 2013 WL 4680491, at *1–5.

Wells raised the following six assignments of error on appeal to the Ohio Court of

Appeals:

I. Appellant's constitutional rights were violated when the charges were not dismissed when he was not brought to trial tried within the statutory time period for speedy trial.

II. Appellant was denied due process when the trial court erroneously limited the scope of the hearing related to Appellant's motion to suppress identification testimony and by denying his motion to suppress.

III. The trial court erred where the jury was not instructed on the failure to comply with photo lineup procedures in accordance with Ohio Rev. Code § 2933.83.

IV. Appellant was denied a fair trial when the trial court allowed inadmissible evidence to be introduced at trial.

V. Appellant's convictions are against the manifest weight of the evidence.

VI. The trial court erred when it denied Appellant's motion for acquittal under Ohio Crim. R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

7

(Doc. 17-1, at 123).

The Ohio Court of Appeals found Wells's assignments of error to be without merit and affirmed his conviction. *Wells*, 2013 WL 4680491, at *23. Wells then filed a timely notice of appeal with the Supreme Court of Ohio raising the following issues:

> I. When a defendant is arrested for a probation violation and a pending charge, and he or she is not brought before a court for resolution of the probation violation pursuant to R.C. 2951.08(B), the probation holder is not valid and the three-count provision in R.C. 2945.71(E) applies to each day that the defendant spends in jail in lieu of bail for purposes of calculating the defendant's speedy-trial time.

> II. If the police present an eyewitness with multiple photo arrays and include a photograph of the defendant in each array, the resulting identification is not reliable because it was caused by unduly suggestive police procedures.

(Doc. 17-2, at 32).

The Supreme Court of Ohio declined to accept jurisdiction of Wells's appeal on March 12, 2014. (Doc. 17-2, at 117).

On January 4, 2013, Wells filed a *pro se* petition to vacate or set aside the judgment of conviction or sentence with the trial court. In his petition, Wells raised the following arguments:

> I. The Petitioner was denied his Due Process rights to a Fair trial guaranteed by the Fourteenth Amendment of the unitedstates constitution. [sic]

> Statement of Facts supporting claim: Cuyahoga County Prosecutors entered into a Judicial Conspiracy with Officer Stacey Jerrell of the Cuyahoga County Sheriffs [sic] Office to commit perjury in order to wrongfully convict Petitioner.

> II. The Petitioner was denied the effective assistance of trial counsel guaranteed by the Sixth amendment of the unitedstates constitution and Section 10. Article 1. of the ohio constitution. [sic]

> Statement of Facts supporting claim: The Petitioner was Denied the effective assistance of trial counsel by counsel's Failure to call Juanita A. Morgan and Dorthy Hildreth as witnesses For the Petitioner which would have revealed the

Perjured testimony and the Judicial conspiracy committed by the Prosecution and the Sheriff's Office.

(Doc. 17-2, at 119-21).

On September 5, 2014, the trial court denied Wells's petition. (Doc. 17-2, at 234). Wells did not appeal the trial court's decision.

On November 25, 2013, Wells, through counsel, filed an application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B). In this application, Wells argued that he was denied the effective assistance of appellate counsel when counsel failed to raise the following assignments of error:

> I. Mr. Wells' Sixth and Fourteenth Amendment rights to a speedy trial were violated because it took the State 734 days to bring Mr. Wells to trial after his arrest. And Mr. Wells' appellate attorney was ineffective for failing to develop a federal constitutional claim in Mr. Wells' appellate brief. Sixth and Fourteenth Amendment to the United States Constitution. *Strickland v.Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)*; Barker v. Wingo*, 407 U.S. 514, 523, 92 S.Ct. 2188, 33 L.Ed.2d 101 112-113 (1972).

(Doc. 17-2, at 236, 240).

The next day Wells filed a *pro se* application to reopen his direct appeal pursuant to Ohio Appellate Rule 26(B). In this application, Wells argued he was denied the effective assistance of appellate counsel when appellate counsel omitted the following claims:

> I. The defendant was denied his constitutional right to a public trial when the court excluded the defendant's mother and other family members from the courtroom during testimony of the State's main key witness, Stacey Jerrell, and all other trial proceedings.

> II. Failure to challenge probation hold, a potential probation violation based on a crime which occurred before probation community control was imposed. Because of trial counsel's failure to challenge this violation, counsel caused appellant's time to be tolled, and he lost his speedy trial violation claim because of counsel's deficient performance, in violation of the 5th, 6th, and 14th Amendments to the U.S. Constitution.

9

(Doc. 17-2, at 301, 305-06)

The Ohio Court of Appeals denied Wells's applications to reopen his appeal on April 8, 2014. (Doc. 17-2, at 319). Wells did not seek review of the denial of his Rule 26(B) applications with the Supreme Court of Ohio.

On January 20, 2015, Wells filed a pro se petition for a writ of habeas corpus with the Supreme Court of Ohio, which the court subsequently dismissed. (Doc. 17-2, at 330, 350).

Pursuant to *Houston v. Lack*, 487 U.S. 266, 270 (1988), Wells's federal habeas corpus petition is deemed filed with this Court on February 5, 2015, the day Wells placed the petition in the prison mail system. (Doc. 1, at 13). In his petition, Wells presents the following arguments:

> **GROUND ONE:** Trial court did not follow the U.S. Supreme Court six minimum, Fifth Fourteenth due process requirements that apply to revocation for arresting United States citizen for an allege probation violation. Then used the fraudulent hold to violate the Sixth Amendment, and Ohio Statutory Speedy Trial Right.
>
> **GROUND TWO:** A Defendant/Petitioner's right to a fair trial is protected by the Due Process Clauses of the State and Federal Constitutions Fifth and Fourteenth Amendment to the United States Constitution; Sections 10 and 16, Article I of the Ohio Constitution. State used unduly suggestive procedures to secure identification.

(Doc. 1, at 5–6).

Wells then sought to amend his petition raising further grounds for relief. (Doc. 5). The Court granted the motion. (Doc. 6). In his amended petition, Wells raised the following arguments:

10

**GROUND THREE:** Trial court violated the statutory provisions. The case did not proceed to trial within 270 days of three-for-one (90 days) if held in lieu of bail, which led to Fifth, Sixth, and Fourteenth Amendment to the U.S. Constitution violations.

**GROUND FOUR:** Under the Sixth and Fourteenth Amendments to the U.S. Constitution, Petitioner asked five times on record for his statutory federal constitutional speedy-trial rights, which were violated and grossly ignored when the trial court took 734 days to bring petitioner to trial after his arrest.

**GROUND FIVE:** Petitioner proceeded to trial without the assistance of counsel. Trial counsel did not assist Petitioner in Case No. 525-073 - probation arrest. Trial counsel did not call witnesses for Petitioner's defense. Trial counsel had an affidavit from State's key witnesss's mother, stating that her son, Deputy Sheriff Stacey Jarrell, was having his life threatened unless he provided perjured testimony for Prosecutor Aaron Brockler. Trial counsel had information of affidavit almost two months before trial. In addition, the mother of Petitioner was thrown out of the courtroom multiple times. She begged to be present for her son's trial, but trial counsel did nothing. It would seem evident that trial counsel was assisting the prosecution. There were witnesses and evidence "affidavit" not introduced. This demonstrates the incompetence of the trial counsel. There is reasonable probability that, for counsel's purposeful, unprofessional errors, the result of the proceedings would have been different. Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were all violated.

**GROUND SIX:** Post-conviction relief in violation of the Fifth, Sixth, and Fourteenth Amendments. The prosecutor threatened State official Stacey Jarrell to wear his uniform, badge, and gun, and to commit perjury under oath - stating that he is Petitioner's cousin and that Petitioner is the one on the video committing the murder. This is an extra-judicial conspiracy to find Petitioner guilty. Thus, Petitioner did not receive a fair and public trial.

**GROUND SEVEN:** Petitioner's right to a fair and public trial was violated. Under U.S. court precedent and the Sixth Amendment to the U.S. Constitution, the trial court violated Supreme Court precedent when the trial judge and Prosecutor Aaron Brockler threw Petitioner's mother out of the courtroom multiple times as she tried to attend the trial, and also excluded other family members from all trial proceedings without any legal justification and without meeting the requirements under U.S. Supreme Court. Petitioner has a constitutional and federal right to a public and fair trial. Fifth, Sixth, and Fourteenth Amendments.

**GROUND EIGHT:** The Eighth District Court erred and violated Petitioner's right to confront witnesses, due process, and equal protection when it allowed the State trial court to add new evidence to the record for the first time at the appellate level, which is prohibited by law, and then deciding the appeal on the basis of this

new evidence. This is in violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

**GROUND NINE:** Prosecutor misconduct in the form of threatening a state official to commit perjury. Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. This is a violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

**GROUND TEN:** Petitioner's Eighth Amendment right to have bail, in Case No. 536-779, was violated because of the illegal arrest warrant for an alleged probation violation, along with the fraudulent hold, phantom hold, in Case No. 525-073. The trial court used the alleged violation as a weapon to hold Petitioner without bail because Petitioner still could not get out due to an alleged violation. Even if Petitioner posted bail he could not get out because of the fraudulent, illegal, due process violation of an alleged probation violation that led to many more federal and constitutional speedy-trial rights under the Fifth, Sixth, and Fourteenth Amendments. It is clear that the trial court thought that Petitioner was arrested for a probation violation for the murder. Judge Brian Corrigan said as much. When the trial court and prosecutor found out three years later that they were in error, while Petitioner was before the Eighth District Appellate Court, they started claiming that Petitioner was arrested for a dirty urine. It is clear that Petitioner is being held today unlawfully, and that his rights were, and still are, being continually, grossly, and clearly violated by the trial court. His Fifth, Sixth, and Fourteenth Amendment rights are being violated.

**GROUND ELEVEN:** Petitioner was denied due process of law when the court sentenced him as a probation violator without specifying what the alleged probation violation was. Since the trial court speaks only through its journal, any action it undertook in the absence of a journal entry is of no effect. Fifth and Fourteenth Amendment violations.

**GROUND TWELVE:** Petitioner was denied due process of law when he was unlawfully restrained of his liberty for an illegal, unconstitutional, fraudulent, alleged probation violation. The trial court and the State used the illegal probation violation as a weapon. Petitioner was never found guilty of a violation.

**GROUND THIRTEEN:** Petitioner was arrested and unlawfully restrained of his liberty for a one-year sentence as a probation violator, held in the county jail for 734 days, and then had his probation terminated. Petitioner's Fourth and Eighth Amendment rights were violated when he was held over sentence. Case No. 525-073 was used as a weapon to violate Case No. 536-779.

**GROUND FOURTEEN:** Petitioner was denied due process of law when he was unlawfully restrained of his liberty for an alleged probation violation for a murder

12

without having the U.S. Supreme Court minimum due process requirements that apply to a revocation hearing for probation.

**GROUND FIFTEEN:** Petitioner was arrested on an alleged probation violation April 13, 2010, by the East Cleveland Police Department. The capias was issued CR-525073 on April 8, 2010, by Probation Officer Jose Casiano. Petitioner never saw nor heard from Casiano until March of 2013, at which time the State Prosecutor was asking to expand the record with new evidence for the first time at the appellate level - contrary to law. A reviewing court cannot add matter to the record before it which was not part of the trial court proceeding and then decide the appeal on the basis of the new matter. The Eighth District erred and seriously violated Petitioner's Sixth Amendment confrontation clause, and Fifth and Fourteenth Amendment due process rights.

**GROUND SIXTEEN:** Petitioner never had an adequate record for review on appeal. To satisfy the sufficiently informed requirement, due process requires a trial court judge to link the evidence of a probationer's wrongful conduct to a specific rule violation. Petitioner was not sufficiently informed of the probation rule(s) he had violated, nor of the supporting evidence for determining that Petitioner had violated a probation rule. Petitioner's Fifth and Fourteenth Amendment due process rights were violated.

**GROUND SEVENTEEN:** Petitioner received ineffective assistance of appellate counsel. The Eighth District Appellate Court held an oral argument on April 23, 2013, in which the appellate court wanted to address the probation hold, being that it was linked to the issue of speedy-trial violation. The Eighth District Court held that, sua sponte, the Court orders the parties to submit additional briefs and be prepared to discuss at oral argument the reason and nature of probation violation in Case No. 525-073 and the effect it has on the computation of time for speedy-trial purposes in Case No. 536-779. Petitioner's appellate counsel failed to challenge the legality of the probation hold, the potential violation of the scope of the hold, and failed to raise an ineffective assistance of counsel claim on trial counsel. The judge threw out Petitioner's mother from the courtroom and excluded her and other family members from all trial proceedings. Petitioner's counsel failed to raise this structural issue on appeal. Petitioner's appellate counsel was also ineffective for failing to adequately present to the appellate court a federal speedy-trial challenge. This is a Fifth, Sixth, and Fourteenth Amendment violation.

**GROUND EIGHTEEN:** The trial court lacked jurisdiction to revoke probation. Petitioner was never found guilty of a violation. The trial court retains inherent power to vacate the alleged violation as void. The alleged violation was used as a weapon in the murder case to hold Petitioner during its investigation. This led to violation of Petitioner's speedy-trial right in Case No. 536-779, and to hold Petitioner in jail even if he could post bail. The trial court lacked subject matter jurisdiction in Case No. 525-073 when Petitioner was denied the U.S. Supreme

13

Court minimum due process requirements that apply to arresting Petitioner for an alleged probation violation without evidence or ever having been found guilty of a violation. Therefore, all action taken in the murder case, No. 536-779, was an act of violating and denying Petitioner's right to have a speedy trial. Fifth, Sixth, and Fourteenth Amendments of due process.

(Doc. 5, at 3-8).

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court cannot grant a habeas corpus petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d). Under the contrary to clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Under the unreasonable application clause, a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the petitioner's case. *Id*. at 413. To obtain habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

To analyze whether a state court decision is contrary to or an unreasonable application of clearly established Supreme Court precedent, courts look only to the holdings of the Supreme

14

Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). The state court's factual findings are presumed correct unless rebutted by the habeas corpus petitioner by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004).

**DISCUSSION**

Wells raises several arguments regarding his two prior convictions. The convictions, with their respective grounds for relief, will be individually addressed.

### A. Case No. CR-09-525073 (Drug Conviction)

Wells has raised several arguments challenging the validity of his arrest and incarceration regarding his probation violation for his drug conviction in case CR-09-525073 (Grounds 5, 11, 12, 13, 14, and 16). Grounds 1, 10, 15, and 18 of Wells's habeas corpus petition raise issues related to both his drug conviction and murder conviction. To the extent grounds 1, 10, 15, and 18 are applicable to the drug conviction, the legal analysis of this section of the undersigned's report is applicable.

Wells's arguments regarding his drug conviction and subsequent incarceration for violating the terms of his probation relating to the conviction must be denied for three reasons. First, the petition is barred by the applicable statute of limitations. Wells was sentenced on March 22, 2010. On April 7, 2010, the trial court issued a capias at the request of a probation officer. The trial court dismissed Wells's community control sanction on April 30, 2012, and Wells failed to appeal or collaterally challenge the conviction and incarceration in the state courts of Ohio. Wells did not file his habeas corpus petition with this Court until February 5, 2015.

The AEDPA provides a one-year statute of limitations for a writ of habeas corpus by a person in custody pursuant to a judgment of a state court. 28 U.S.C. § 2244(d)(1). Although the statute of limitations is "not jurisdictional," it "effectively bars relief absent a showing that the petition's untimeliness should be excused based on equitable tolling and actual innocence." *Akrawi v. Booker*, 572 F.3d 252, 260 (6th Cir. 2009). The one-year statute of limitations begins to run after the exhaustion of available state court remedies. 28 U.S.C. § 2244(d)(2). The statute of limitations does not begin to run until the time for filing a petition for a writ of certiorari for direct review to the United States Supreme Court has expired. *King v. Bell*, 378 F.3d 550, 552 (6th Cir. 2004).

Ignoring the fact that Wells never appealed his drug conviction and the procedural bar which occurs as a result of this inaction, Wells's time to seek habeas review of the drug conviction and subsequent incarceration expired long ago. The petition, to the extent it challenges Wells's drug conviction and incarceration in CR-09-525073, is barred by the one-year statute of limitations of § 2244(d)(1).

The undersigned further notes that Wells has not attempted to show, nor is it evident from the record, that he is entitled to equitable tolling which would have stopped the running of the statute of limitations. Wells has the burden of establishing his entitlement to equitable tolling. *See Jurado v. Burt*, 337 F.3d 638, 642 (6th Cir. 2003). In order to meet this burden, Wells has to show that extraordinary circumstances prevented the filing of his petition, and that he was diligent in pursuing his case. *Holland v. Florida*, 560 U.S. 631, 649 (2010). Wells has not met this burden. Therefore, Wells is not entitled to equitable tolling.

Second, Wells's arguments regarding his drug conviction and incarceration for his parole violation are procedurally barred. The record establishes that Wells did not appeal his drug

conviction and incarceration to the appellate courts of Ohio. Because of his failure to file a direct appeal, any claims Wells may have regarding his drug conviction and parole violation are now defaulted for purposes of federal habeas corpus review. This is because the state courts of Ohio would find Wells's claims procedurally barred. *See Solether v. Williams*, 527 F. App'x 476, 483 (6th Cir. 2013); *Williams v. Bagley*, 380 F.3d 932, 966–67 (6th Cir. 2004) (holding that an unexhausted claim was procedurally defaulted in habeas corpus review because it would be procedurally barred under Ohio's doctrine of res judicata); *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."). Further, Wells has not made any showing to excuse this default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Solether*, 527 F. App'x at 483.

Third, a petitioner must be "in custody" pursuant to a state conviction when the habeas corpus petition is filed in order to vest the district court with jurisdiction. 28 U.S.C. § 2254(a); *Maleng v. Cook*, 490 U.S. 488, 490–91 (1989). When a petitioner's sentence for a conviction has fully expired, the conviction may not be directly challenged because the petitioner is no longer "in custody" pursuant to that conviction. *Lackawanna County Dist. Attorney v. Coss*, 532 U.S. 394, 401 (2001). Whether a petitioner is in "custody" is determined at the time the habeas corpus application is filed. *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968). Thus, Wells may not file a habeas corpus petition challenging his 2010 drug trafficking conviction and parole violation because he is no longer "in custody" pursuant to that conviction. *See* 28 U.S.C. § 2254(a); *Lackawanna*, 532 U.S. at 401.

**B. Case No. 10-536779**

Before seeking a writ of habeas corpus in federal court, a petitioner must first exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999). This requirement is designed to give state courts the initial opportunity to pass upon and, if necessary, correct errors of federal law in a state prisoner's conviction or sentence. *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995); *Picard v. Connor*, 404 U.S. 270, 275–76 (1971). The purpose of exhaustion "is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992).

To properly exhaust state remedies, the petitioner must "fairly present" a claim in each of the appropriate state courts, including a state supreme court, in a procedurally appropriate manner. *O'Sullivan*, 526 U.S. at 845. In Ohio, this requires direct and delayed appeals to the Ohio Court of Appeals and the Supreme Court of Ohio. *See Allen v. Perini*, 424 F.2d 134, 140 (6th Cir. 1970).

> As the Supreme Court noted in *Picard*,
>
> If the exhaustion doctrine is to prevent unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution, it is not sufficient merely that the federal habeas applicant has been through the state courts. The rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts. Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, we have required a state prisoner to present the state courts with the same claim he urges upon the federal courts.

*Picard*, 404 U.S. at 275–76 (internal quotation marks and citations omitted). "It is not enough that all the facts necessary to support the federal claim were before the state courts, . . . or that a

somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6–7 (1982) (citations omitted). The legal and factual "substance" of the federal claim must have been presented to the state courts. *O'Sullivan*, 526 U.S. at 844–45; *Anderson*, 459 U.S. at 6–7. The claim to the state courts must be presented as a federal constitutional claim, not merely as an issue arising under state law. *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).

Ordinarily, a state prisoner does not "fairly present" a claim to a state court if the petition, brief, or document does not alert the court "to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

> In determining whether a petitioner has fairly presented a federal constitutional claim to the state courts, a habeas court may consider whether (1) the petitioner phrased the federal claim in terms of the pertinent constitutional law or in terms sufficiently particular to allege a denial of the specific constitutional right in question; (2) the petitioner relied upon federal cases employing the constitutional analysis in question; (3) the petitioner relied upon state cases employing the federal constitutional analysis in question; or (4) the petitioner alleged facts well within the mainstream of the pertinent constitutional law. *See Hicks v. Straub*, 377 F.3d 538, 553 (6th Cir. 2004) (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). A petitioner need not cite "chapter and verse" of constitutional law, *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987), but "[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated." *McMeans*, 228 F.3d at 681 (citing *Petrucelli v. Coombe*, 735 F.2d 684, 688–89 (6th Cir. 1984)).

*Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004).

A petitioner wanting to raise a federal issue can indicate the federal law basis for the claim in a state-court petition or brief by citing the federal source of law or a case deciding such a claim on federal grounds. *Baldwin*, 541 U.S. at 32.

In Ohio, a criminal constitutional question cannot be raised in the Supreme Court of Ohio unless it was presented and argued in the lower court. *State v. Phillips*, 272 N.E.2d 347, 352

(Ohio 1971). Where an appeal is taken to the Supreme Court of Ohio, the court will not consider or determine errors that were not raised and preserved in the court of appeals. *Id*. Thus, an issue raised for the first time in the Supreme Court of Ohio is waived. It will not be reviewed by the Supreme Court of Ohio, and the issue is deemed not to have been properly exhausted for federal habeas review. *See Leroy v. Marshall*, 757 F.2d 94, 99 (6th Cir. 1985); *Phillips*, 272 N.E.2d at 352.

The failure to properly present a federal ground to the state courts constitutes procedural default or waiver barring federal habeas review. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996). When the petitioner fails to fairly present to the state courts the claim on which he seeks relief in federal court, and the opportunity to raise that claim in state court has passed, the petitioner has procedurally defaulted that claim. *O'Sullivan*, 526 U.S. at 853–54.

Federal courts will normally consider a default to have occurred if the last "reasoned state judgment rejecting a federal claim" makes a plain statement regarding the procedural default. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). If the relevant issues were not presented at all to the state courts, the statement is unnecessary. *Harris v. Reed*, 489 U.S. 255, 263 n.9 (1989).

A habeas corpus petitioner procedurally defaults a claim if:

(1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.

*Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (citations omitted); *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

The "cause" standard in procedural–default cases requires a petitioner to show that "some objective factor external to the defense" impeded his efforts to raise a claim in the state courts. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (internal quotation marks omitted). Such factors

may include interference by officials, an attorney error rising to the level of ineffective assistance of counsel, or a showing of a factual or legal basis for a claim that was not reasonably available. *Id*. at 493–94.

Finally, violations of state law or state procedures are not normally cognizable in habeas corpus proceedings. *Mijkovic v. Woods*, 517 F. App'x 392, 393 (6th Cir. 2013); *Brown v. McKee*, 460 F. App'x 567, 572 (6th Cir. 2012).

### 1. Grounds 1, 3, and 4

Wells claims that he was denied his Constitutional right to a speedy trial. (Doc. 1, at 5; Doc. 5, at 3). On direct review to Ohio's appellate courts, Wells failed to present the federal nature of the claims. (Doc. 17-1, at 119; Doc. 17-1, at 429). The legal and factual substance of a federal claim must have been presented to the state courts. *Anderson*, 459 U.S. at 6–7; *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Wells failed to cite federal case law or make an argument in constitutional terms in his filings with the Ohio Court of Appeals and the Supreme Court of Ohio. Rather, Wells's argument is based on the state's applicable rules of evidence and case law.

Using constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue. *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006). In addressing Wells's speedy trial arguments, the Ohio Court of Appeals stated:

> {¶ 53} The statutory speedy trial provisions of R.C. 2945.71 and the constitutional guarantees found in the Ohio and United States Constitutions are coextensive. *See State v. King*, 70 Ohio St.3d 158, 160, 1994–Ohio–412, 637 N.E.2d 903; *State v. O'Brien*, 34 Ohio St.3d 7, 516 N.E.2d 218 (1987). Because we have found no statutory speedy trial violation in Wells's case, the burden is upon him to demonstrate that his constitutional right to a speedy trial has been denied. *State v. Gettys*, 49 Ohio App.2d 241, 244, 360 N.E.2d 735 (3d Dist. 1976); *State v. Bound*, 43 Ohio App.2d 44, 47, 332 N.E.2d 366 (8th Dist. 1975).

{¶ 54} "The constitutional right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution." *State v. Kutkut*, 8th Dist. Cuyahoga No. 98479, 2013–Ohio–1442, ¶ 10, citing *State v. Carmon*, 8th Dist. Cuyahoga No. 75377, 1999 Ohio App.LEXIS 5458, *3, 1999 WL 1044603 (Nov. 18, 1999)." 'The statutory time requirements of R.C. 2945.71 to 2945.73 are not relevant to a determination of whether a defendant's constitutional right to a speedy trial has been violated by an unjustified delay in prosecution.'" *Id*., quoting *Carmon* at *4. Instead, courts should employ the balancing test of the factors enunciated by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530–533, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The factors to be weighed include: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his speedy trial right; and (4) prejudice to the defendant. *Kutkut* ¶ 10, citing *Carmon* at *4–5. No single factor is regarded "* * * as either a necessary or sufficient condition to the finding of a deprivation to the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker* at 533.

{¶ 55} Although Wells briefly asserted that he had been denied his constitutional right to a speedy trial in his pro se motions, his arguments below and on appeal focus upon his statutory speedy trial rights, and he fails to make any argument or address the *Barker* factors on appeal. App.R. 16(A) requires a party to separately argue each assignment of error. Pursuant to App.R. 12(A)(2), an appellate court may disregard any assignment of error, or portion thereof, if the appellant fails to make a separate argument. *See State v. Newberry*, 77 Ohio App.3d 818, 820, 603 N.E.2d 1086 (4th Dist.1991).

{¶ 56} Moreover, Wells has failed to withstand his burden by failing to address the *Barker* factors. See, e.g., *State v. Winn*, 8th Dist. Cuyahoga No. 98172, 2012–Ohio–5888, ¶ 43 (defendant must first make a threshold showing of "presumptively prejudicial" delay to trigger application of *Barker* analysis). Therefore, because Wells did not develop the issue regarding his constitutional right to a speedy trial in the trial court or here on appeal, an analysis under *Barker* is unnecessary. *State v. Stokes*, 193 Ohio App.3d 549, 2011–Ohio–2104, 952 N.E.2d 1192, ¶ 9 (12th Dist.), citing *State v. Russell*, 4th Dist. Athens No. 97 CA 37, 1998 Ohio App.LEXIS 3176, *12 (June 30, 1998).

*Wells*, 2013 WL 4680491, at *10.

Thus, Wells's speedy trial claims fail to entitle him to habeas corpus relief. As the decision by the Ohio Court of Appeals establishes, the argument was presented as a violation of state law, which is not cognizable in habeas corpus proceedings. *Mijkovic*, 517 F. App'x 393; *Brown*, 460 F. App'x at 572. Further, the court's opinion establishes that the claim was not

presented as a federal constitutional claim. *Franklin*, 811 F.2d at 325; *Koontz*, 731 F.2d at 368. Finally, the court of appeals found that to the extent that the argument could be construed as being raised as a federal constitutional claim, Wells failed to raise the issue in the trial court and on appeal. Therefore, the issue has been defaulted, *Ylst*, 501 U.S. at 803, and Wells has not established cause to excuse his default, *McCleskey*, 499 U.S. at 493; *Guilmette*, 624 F.3d at 290; *Maupin*, 785 F.2d at 138.

### 2. Grounds Five and Seven

In ground five, Wells alleges his trial counsel was ineffective, while in ground seven he alleges the trial court excluded his mother and other family members from court proceedings. Wells failed to raise these issues on direct appeal. Rather, the issues were raised as the underlying reasons for his ineffective assistance of appellate counsel claim in the Ohio Appellate Rule 26(B) applications. The Rule 26(B) applications alleging ineffective assistance of appellate counsel only preserves the ineffective assistance of counsel claim as opposed to the underlying claims. *See Lott v. Coyle*, 261 F.3d 594, 612–13 (6th Cir. 2001). Further, Wells failed to file an appeal to the Supreme Court of Ohio from the dismissal of the Rule 26(B) applications, *Leroy*, 757 F.2d at 99, and the rules of the Supreme Court of Ohio prohibit delayed appeals of Rule 26(B) proceedings. Ohio Supreme Court Rule of Practice 7.01(A)(4)(c).

Because Wells failed to raise these arguments in his direct appeal, he must demonstrate cause and prejudice. An ineffective assistance of appellate counsel claim does not constitute cause for a procedural default where the claim itself is procedurally defaulted. *Williams v. Lazaroff*, 648 F. App'x 548, 554 (6th Cir. 2016). Wells has not shown that he "might not have been convicted" but for these errors. *Reed v. Ross*, 486 U.S. 1, 12 (1984). Further, this is not a case where the alleged constitutional violations resulted in the conviction of one who is actually

innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Therefore, Wells is not entitled to habeas corpus relief on these arguments.

### 3. Grounds Six and Nine

In his sixth and ninth grounds for relief, Wells alleges prosecutorial misconduct asserting that the prosecutor presented false testimony at trial. These arguments were presented in his post-conviction motion which the trial court denied. However, Wells failed to appeal the trial court's decision denying the motion. Therefore, Wells has procedurally defaulted these claims by failing to present them to the Ohio Court of Appeals and the Supreme Court of Ohio. *Leroy*, 757 F.2d at 99. Ohio will not allow Wells to file a delayed appeal, *State v. Nichols*, 463 N.E.2d 375, 378 (Ohio 1984), and this procedural rule serves as an adequate ground to bar habeas corpus review. *See Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). Finally, Wells has not met the requirements of *Maupin* to establish cause and prejudice, *Maupin*, 785 F.2d at 138, nor has he established that these alleged constitutional violations "probably resulted in the conviction of one who is actually innocent . . . ." *Murray*, 477 U.S. at 496.

### 4. Grounds Seven and Fifteen

In grounds seven and fifteen, Wells alleges the Ohio Court of Appeals erred by allowing the government to supplement the record on appeal. However, these arguments are based on alleged violations of state law which are not cognizable in habeas corpus proceedings. *Mijkovic*, 517 F. App'x 393; *Brown*, 460 F. App'x at 572. As the Sixth Circuit has explained:

> Whether or not the [state court] complied with the procedural requirements of [state] law is not a matter for this court to decide on a petition for habeas corpus relief. The federal habeas court does not act as an additional state appellate court to review a state court's interpretation of its own law or procedure.

*Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987) (citations omitted); *see also Johns v. The Supreme Court of Ohio*, 753 F.2d 524, 527 (6th Cir. 1985). Accordingly, these arguments are not cognizable for federal habeas corpus relief. *Oviedo*, 809 F.2d at 328.

### 5. Ground Ten

In his tenth ground, Wells asserts that his Eighth Amendment right to bail was violated because he was being held for an alleged probation violation. As previously noted, to the extent the argument can be construed as alleging a violation of Wells's rights as it relates to his drug conviction and probation violation, the argument is not cognizable on habeas corpus review. Applying the argument to Wells's murder conviction, the issue still does not entitle Wells to habeas corpus relief. The argument was not raised by Wells in his direct appeal to the Ohio Court of Appeals or the Supreme Court of Ohio. The state courts of Ohio would find Wells's Eighth Amendment claim procedurally barred. *See Solether*, 527 F. App'x at 483; *Bagley*, 380 F.3d at 966–67; *Wong*, 142 F.3d at 322. Further, Wells has not made a showing to excuse this default. *See Coleman*, 501 U.S. at 750; *Solether*, 527 F. App'x at 483. Therefore, the argument is procedurally barred.

Wells acknowledges, and the record establishes, that the trial court set a bond of $500,000. Wells was not denied bail and ground ten does not entitle Wells to habeas corpus relief.

### 6. Ground Seventeen

In his seventeenth ground for relief, Wells alleges ineffective assistance of appellate counsel. The claim was raised in his Rule 26(B) applications. The applications were denied by the Ohio Court of Appeals. However, Wells again defaulted this ground for relief as he failed to file an appeal with the Supreme Court of Ohio. As previously discussed regarding his other

defaulted issues, Wells has not met the requirements of *Maupin* to establish cause and prejudice, *Maupin*, 785 F.2d at 138, nor has he established that this alleged constitutional violation resulted in the conviction of an innocent person. *Murray*, 477 U.S. at 496. Therefore, Wells is not entitled to habeas corpus relief on this ground.

### 7. Ground Two

Ground two is the only issue which has been properly preserved for federal habeas corpus review. Wells asserts that the state used unduly suggestive procedures to secure his identification by witnesses. "The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, ___ U.S. ___, 132 S. Ct. 716, 723 (2012). Nevertheless, "the Supreme Court has carved out a narrow exception from this general rule for eyewitness identifications: Due process prohibits the introduction of such evidence if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.." *United States v. Washam*, 468 Fed. App'x 568, 570 (6th Cir. 2012) (citation and internal quotation marks omitted). A conviction based on identification testimony that follows a pretrial identification violates due process when "the pretrial identification procedure is so 'impermissively suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir.1994) (quoting *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir.1986)). To exclude such identifications, a defendant must show that the identification procedure was unduly suggestive and the identifications were not otherwise reliable. *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

26

The Court must engage in a two-step analysis in deciding whether the accused's right to due process has been violated through the use of a pretrial identification procedure. *Perry*, 132 S. Ct. at 724. First, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Id*. (citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109 (1977)); *Neil*, 409 U.S. at 198. The defendant bears the burden of proving this element. *Ledbetter*, 35 F.3d at 1071.

"Even when the police use such a procedure . . . , suppression of the resulting identification is not the inevitable consequence." *Perry*, 132 S. Ct. at 718. Rather, the second step of the undue-suggestiveness framework requires an inquiry into "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199. The factors to be considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when identifying the defendant; and (5) the length of time between the crime and the identification. *Manson*, 432 U.S. at 114; *Neil*, 409 U.S. at 199–200; *United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000).

If an identification resulting from an unduly suggestive procedure is nevertheless deemed reliable, it is admissible, "[n]otwithstanding the improper procedure" used by the police. *Perry*, 132 S. Ct. at 725; *see also Washam*, 468 Fed. App'x. at 570–71 (explaining that "[t]o exclude [eyewitness] identifications, a defendant must show that the identification procedure was unduly suggestive and the identifications were not otherwise reliable").

The Ohio Court of Appeals addressed Wells's claim on the merits, finding that the procedures used in obtaining the pretrial identifications were not unduly suggestive and the identifications were reliable. The court stated:

{¶ 58} In his second assignment of error, Wells argues that he was denied due process when the trial court erroneously limited the scope of the hearing related to his motion to suppress identification testimony. He also contends that the trial court erred in denying his motion to suppress because the photo arrays used were unduly suggestive and unreliable, and any witness identification made based on the Crimestoppers video was unreliable.

. . . .

{¶ 60} Wells first contends that the trial court erroneously limited the scope of the voir dire of witnesses to only whether the photo array was unduly suggestive, and did not allow him to question the witnesses regarding reliability.

. . . .

{¶ 63} An identification derived from unnecessarily suggestive procedures, which have a likelihood of leading to a misidentification, violates a defendant's right to due process. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In determining the admissibility of challenged identification testimony, a reviewing court applies a two-prong test: (1) did the defendant demonstrate that the identification procedure was unduly suggestive; and, if so, (2) whether the identification, viewed under the totality of the circumstances, is reliable despite its suggestive character. *State v. Harris*, 2d Dist. Montgomery No. 19796, 2004–Ohio–3570, ¶ 19, citing *State v. Wills*, 120 Ohio App.3d 320, 324, 697 N.E.2d 1072 (8th Dist.1997); *see also State v. Thompson*, 8th Dist. Cuyahoga No. 90606, 2009–Ohio–615, ¶ 32, citing *State v. Page*, 8th Dist. Cuyahoga No. 84341, 2005–Ohio–1493. If the pretrial confrontation procedure was not unduly suggestive, any remaining questions as to reliability go to the weight of the identification, not its admissibility, and no further inquiry into the reliability of the identification is required. *Wills* at 325, 697 N.E.2d 1072.

{¶ 64} . . . After hearing testimony from the witnesses, the trial court determined that the identification procedures employed in the photo array identifications were not unduly suggestive. Accordingly, as will be further discussed below, Wells did not withstand his initial burden of establishing that the identification procedure was unduly suggestive and limiting the hearing was therefore not in error.

. . . .

{¶ 65} After Detective Smith learned of a possible suspect in 2010, he contacted the Cleveland Photo Lab and a six-pack photo array was created. A second photo array was also established from pictures obtained from the sheriff's department. Detective Smith testified that the purpose for preparing two photo arrays was because he wanted to depict Wells at two different times in his life with different facial hair so the witnesses could be certain of the identification.

{¶ 66} The first photo array is a six-pack of black and white photographs all appearing on a single piece of paper. Detective Smith testified that he inspected the array and was satisfied with the quality of the array, although he agreed that Wells's photograph in this array appeared lighter than the others but was unsure why. Each photograph in the array is of a black male with short hair and a moustache. Wells's photograph was fourth in the array. Other than the lighting of Wells's photograph, no other factors are present distinguishing Wells's photograph from the others in the first array.

{¶ 67} The second photo array also contains six photographs, but the photographs are in color and each picture is on a separate piece of paper. Detective Smith agreed that Wells has silver and gray coloring in his beard, whereas the others do not. Additionally, the background behind Wells appears lighter. Each photograph contains a black male with short hair and some variation of facial hair. Wells's photograph was again in the fourth position for Detective Smith's "organizational consistency." Moreover, Wells's photograph was the only photograph contained in both arrays.

. . . .

{¶ 39} [sic] Where the men depicted in the photo array with the defendant all appear relatively similar in age, features, skin tone, facial hair, dress, and photo background, the photo array is not impermissibly suggestive. *State v. Jacobs*, 7th Dist. Mahoning No. 99–CA–110, 2002–Ohio–5240, ¶ 18. Generally a photo array is not unduly suggestive due solely to different backgrounds. *See State v. Carter*, 2d Dist. Montgomery No. 21145, 2006–Ohio–2823, ¶ 33, citing *State v. Nelson*, 8th Dist. Cuyahoga No. 81558, 2003–Ohio–3219; *but see State v. Johnstone*, 8th Dist. Cuyahoga No. 92885, 2010–Ohio–1854 (lighter background color of defendant's picture contributed to flawed identification procedure.)

{¶ 70} Detective Smith testified that he met with Wiley and advised her to look at the photo array to see if there was anyone she recognized and if so, who it was and how she recognized the individual. According to Detective Smith he handed Wiley the photo array and stepped back; she identified Wells in photograph number 4 as the man who shot Webb.

{¶ 71} Wiley testified that Detective Smith did not say or indicate who to pick or that any particular person was in the photo array. Wiley said that she viewed the black and white photo array first and was asked by Detective Smith to identify

anyone in the picture that she knew or had seen before. She then pointed out the person in fourth position and identified him as the "the man that I saw shot [sic] the other man." She then looked at the second photo array of the individual pictures and identified the "man" in position four with the "white background." Wiley testified that the background color of the photograph did not help her identify Wells from the photo array and she was sure the person pictured in photograph number 4 was the person she saw on the day of the murder.

{¶ 72} Detective Smith testified that he met with Jasmine Diaz and gave her the same instructions that he gave Wiley. According to Diaz, Wiley identified Wells in photograph number 4 as the man she talked to prior to the homicide.

{¶ 73} Diaz testified that Detective Smith did not suggest to her who to pick, but "to do my best in picking out who looked familiar." She then looked at the black and white array first and picked photograph number 4 and identified him as "Eric." She stated that she saw him the day before and the day of the shooting. She also identified Wells in photograph number 4 in the second array. Although Diaz admitted that Wells's photographs appeared lighter, she stated that she "can never forget a face with or without a do-rag."

{¶ 74} There was no testimony by any witness that the positioning of Wells's photograph in the second photo array influenced the witnesses's identifications. Both Wiley and Diaz identified Wells as the person they saw the day that Webb was shot and identified him in the first photo array. The fact that Wells's photograph was also the fourth photograph in the second array does not negate the positive identification in the first photo array. Moreover, the fact that the two photo arrays placed the intended suspect in the same numerical position is not unduly suggestive. *State v. Sealy*, 10th Dist. Franklin No. 09AP–1128, 2010–Ohio–6294, ¶ 29.

{¶ 75} Accordingly, neither the photo arrays nor the identification procedures employed were impermissibly suggestive to warrant suppression of the out-of-court identifications by Wiley and Diaz.

. . . .

{¶ 90} Wells's final challenge regarding suppression involves the out-of-court identification made by Stacy Jarrell from the Crimestoppers video. He contends that the identification was wholly unreliable under the totality of the circumstances because Jarrell's identification was made only after he heard family members saying that Wells was the person in the videos and that Jarrell, who had seen Wells once in 25 years, based his identification on Wells's walk.

{¶ 92} We note that a motion to suppress was not the proper vehicle to exclude Jarrell's identification testimony. Any objection to this evidence was properly raised in a motion in limine and not in a motion to suppress, which is reserved for

30

constitutional violations. *Hilliard v. Elfrink*, 77 Ohio St.3d 155, 158, 1996–Ohio–333, 672 N.E.2d 166; *see generally State v. French*, 72 Ohio St.3d 446, 1995–Ohio–32, 650 N.E.2d 887.

{¶ 93} Unlike a photo array identification where the state, through the use of law enforcement, is involved in the identification, Jarrell's viewing of the Crimestoppers video was done independently and not at the request of law enforcement.

{¶ 94} Therefore, we consider the voir dire testimony by Jarrell of his out-of-court identification as given under a motion in limine, which was denied. During Jarrell's trial testimony, the court noted Wells's continuing objection regarding Jarrell's testimony and his identification from the Crimestoppers video. . . . [T]he trial court did not abuse its discretion in allowing Jarrell to testify regarding his identification of Wells from the Crimestoppers video.

*Wells*, 2013 WL 4680491, at *11–14.

A federal court may grant habeas corpus relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 412–13. Under this standard, Wells has not shown that the resolution of his identification issue by the state courts of Ohio was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 412–13.

The opinion by the Ohio Court of Appeals addresses Wells's arguments that the identification process and his subsequent identification by certain witnesses was unreliable. The court carefully analyzed the facts of the case under both Ohio law and Supreme Court precedent. The discussion of this issue and the resolution of Wells's arguments are not contrary to decisions by the United States Supreme Court. Therefore, under § 2254(d) and *Williams*, Wells's petition

has not established an unreasonable application of federal law so as to warrant habeas corpus relief.

Finally, the undersigned notes that although Wells also asserted that the identification procedure used by police violated Ohio Rev. Code § 2933.83, as previously explained, alleged violations of state law are not cognizable in habeas corpus proceedings. *Mijkovic*, 517 F. App'x 393; *Brown*, 460 F. App'x at 572.

## CONCLUSION AND RECOMMENDATION

Accordingly, the undersigned recommends that the petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, be dismissed.

s/James R. Knepp II
United States Magistrate Judge

***ANY OBJECTIONS*** to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time ***WAIVES*** the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).